**UNITED STATES et al. v. TODD ENGINEERING DRY DOCK & REPAIR CO., Inc.**

**TODD ENGINEERING DRY DOCK & REPAIR CO., Inc., v. UNITED STATES et al.**

Nos. 19026, 19084.

District Court, E. D. Louisiana.

Oct. 13, 1931.

Edouard F. Henriques, W. Brainerd Spencer, and W. I. Connelly, all of New Orleans, La., and F. R. Conway, of Washington, D. C., for the United States.

Terriberry, Young, Rault & Carroll and Joseph M. Rault and Walter Carroll, all of New Orleans, La., for Todd Engineering Dry Dock & Repair Company.

Dart & Dart and Henry P. Dart, Jr., all of New Orleans, La., and Bigham, Englar, Jones & Houston and Henry N. Longley, all of New York City, for interveners and owners of cargo.

BORAH, District Judge.

The two above-entitled suits grow out of the same state of facts and were on stipulation tried together.

The first suit is brought by the United States, as owner of the steamship West Ira and as bailee of the cargo laden thereon, to

recover damages from the Todd Engineering Dry Dock & Repair Company. The libelant's claim is based on the fact that the respondent, while engaged in performing work on the center boiler under a repair contract, was negligent in the use of an oxyacetylene torch, thereby causing a fire to originate in the boiler room of the West Ira, which rapidly spread to the other parts of the vessel and resulted in great injury and damage to the vessel and cargo. In this proceeding the cargo owners have intervened and are here prosecuting in their own behalf all the rights and actions originally presented for their account by the libel of the government.

The second suit is brought by the Todd Engineering Dry Dock & Repair Company against the United States to recover the value of its services under the repair contract which was in process of execution at the time of the fire. The libelant in this proceeding, hereinafter referred to as the respondent, also asks that it be paid for the service of a salvage barge which was engaged after the fire.

It is not necessary to further examine into the pleadings to ascertain the real issues of the case, for they of course relate to the cause of the fire, and the divergent theories advanced by the respective parties will be first considered and then discussed in the light of the testimony.

The libelants contend that on the afternoon and evening of January 9, 1928, the tank tops in the fire room of the West Ira were littered with oily rags, with pieces of new canvas dropped there during the course of the pipe-covering work, and with old pipe coverings consisting of canvas, muslin, and asbestos; that on this ship, as on any oilburning ship under normal conditions, there was a slight accumulation of oil on the tank tops and on the surface of the water in the bilges; that none of the respondent's employees ever examined the tank tops between the boilers or under the floor plates and never looked into the bilges, nor did they take proper precautionary measures to guard against the danger of fire. That an oxyacetylene torch was being used immediately before the fire was discovered without any one being available to guard against fire and without employing any of the usual safeguards, and that sparks and pieces of molten metal caused by the use of the torch fell on the tank tops and caused the material which the respondent's agents had negligently permitted to accumulate there to burst into flame; that this burning material resting in the accumulation of oil caused the oil on the tank tops to burn, the fire to spread along the tank tops into the bilges, and thence to other parts of the vessel.

The opening statement of respondent's proctor, as well as the pleadings and the evidence offered, show that it is respondent's position that any débris of an inflammable nature which had accumulated as a result of its work had been removed two days prior to the fire. While the respondent admits that two of its employees were in the boiler room on the evening of January 9th when the fire broke out, and that as a result of the fire the ship owned by the libelant and the cargo owned by the interveners sustained serious damage, it is asserted that their servants had neither used the oxy-acetylene torch nor had they any reason to use it for approximately an hour prior to the fire. It is then urged that it was impossible for the fire to have been caused by the use of the oxy-acetylene torch, particularly over in the port bilge, and the theory is advanced that the fire arose because the defective condition of the port furnace of the port boiler caused burning oil to flow out of the furnace on to the tank tops and thence into the bilges.

The issues thus presented largely involve questions of fact, and the proof in the main bears on the respective theories advanced as to the cause of the fire. As the libelants charge negligence, they carry the burden of proving their case by a fair preponderance of the evidence and must show: (1) That the respondent's servants were using an oxy-acetylene torch immediately before the fire; (2) that the tank tops, the place where the fire started, were littered with inflammable débris which was negligently left there by the respondent's agents; (3) that a spark from the burning torch set fire to this material, or show that no other adequate cause existed. See Lancashire Shipping Co. v. Morse Dry Dock & Repair Co. (The Egremont Castle) (D. C.) 43 F.(2d) 750, 1930 A. M. C. 1494. In determining whether the libelants have borne their burden, the proof will be considered under these headings seriatim.

However, before taking up the first point which will require a somewhat detailed discussion of the evidence, it would seem in order to consider when the fire started. While it is not possible to state the time with exact certainty, I am persuaded, from a careful examination of all the testimony bearing thereon, that the fire could not have started

any later than 8 p. m. on Monday, January 9, 1928.

■ Consideration now will be given to the testimony which bears on the question as to whether or not the oxy-acetylene torch was being used immediately before the fire. It is conceded that when the respondent's day shift quit work at 5 p. m. on January 9th, all the boiler repair work had been completed except the construction of the center smoke box doors for the center boiler, and that the upper flame plate of the center smoke box was then hanging in position but nothing further had been done to it. It is also clear from the testimony of respondent's witnesses that in order to carry the work on the upper flame plate to completion, the night shift were required to do the following: The flame plate was to be closed with a helper inside the smoke box who would scribe the landing edge with a pencil to show where the door fitted against the boiler front; the flame plate would then be opened and the position of the landing edge would be back marked on the outside. The next step was to locate the correct positions of the two side angle irons and then burn four holes through the flame plate and attach them thereto, top and bottom, by temporary bolts. As there were in each of the angle irons six holes that had heretofore been punched in the shop, it was next in order to burn eight more holes in the flame plate to correspond with the holes in the angle irons. Rivets were then to be driven through these holes permanently attaching the angle irons to the flame plate, this work including the removal and replacing of the four temporary bolts with rivets. The work of driving the rivets required that the ends to be headed up should be heated with the torch. The next step was to mark off the four dog holes and then burn them through both the angle irons and flame plate. It is contended on behalf of the respondent that, necessarily, the next step was to ream out the dog holes, and when the work should be completed the upper casing plate was to be attached to the upper flame plate by passing nine bolts through nine holes punched in the flame plate in the shop, and through nine holes already existing in the old casing plate. The next operation would be to burn the dog holes through the casing plate and, after these holes should be reamed, dogs were to be placed and the upper door would then be finished and ready to be dogged tightly in position. It is asserted that not until then could the upper flame plate be hung and that it was only after the upper door was completely finished that similar operations could go forward on the bottom section.

The respondent contends that the night shift started to work at about 6:20 p. m. and that somewhere around 7 o'clock, possibly a little after, the work had progressed to the extent that the only thing left to do on the upper section was to ream four dog holes, bolt the casing and flame plate together, and burn the four dog holes through the casing plate and ream them. It is claimed that from that time up until the time when the fire was discovered, that is to say, for approximately an hour, its servants were doing nothing towards advancing the work of finishing the center boiler doors.

The respondent's general foreman, Weibell, testified that he visited the boiler room at 5:30 p. m., surveyed the situation, and found the upper flame plate hanging in position and the lower flame plate and two casing plates on the floor in front of the center boiler. It was his estimate that there was about seven hours' work remaining for two boiler makers and two helpers. Accordingly, at about 20 minutes to 6 he telephoned the Algiers Dry Dock and arranged for Soell and Duplan and two helpers to come on the job. It appears that the men had expected to go on another job and at least three of them already had changed into their working clothes. When the message was received, Soell, the assistant foreman in charge of the night shift, changed back into his street clothes and the men then walked from the yard to the Algiers ferry. Upon arrival at the foot of Canal street, they walked up the river to the vessel at Robin street, a distance of nearly two miles, went aboard the ship, got out their tools and carried them down to the fire room, and then started to work after Soell and possibly Hebert had again changed to their working clothes. Soell said it was 6:15 when he reached the engine room, and his statement undoubtedly furnishes the basis for respondent's contention that the work started at 6:20. However, Dollar testified that it may have been 6:30 when they reached the ship, although he thinks it was probably 6:15 or 6:20. Considering the testimony of these witnesses in the light of physical facts, I am persuaded that the work could not have started before 6:30 p. m.

Having determined when the night shift went to work and knowing to what extent the work had progressed, it is in order to inquire as to the time that would normally be consumed in these operations. Kenney, the re-

spondent's day snapper, was called upon to express his opinion of the time it would take to complete the various operations of burning and riveting that was shown to have been carried out on the upper flame plate by the night shift, and his estimate was that this work would have required a minimum of an hour and twenty-four minutes. It is apparent from the testimony of this witness that he considered only the actual time necessary for the separate operations of burning the twelve rivet holes, burning the four dog holes and placing, heating, and driving the ten rivets, and that he made no allowance for the natural delays between operations, or the time which would be consumed in the various steps that have heretofore been set forth in detail. But assuming that the contrary is true, the conclusion is nevertheless inescapable that the time consumed in completing the operations known to have been carried out must have extended from about 6:30 to the vicinity of 8 o'clock. Consequently, it was impossible for the men to have completed burning operations at 7 o'clock or a little after even if they had been working with the greatest diligence, and the proof in this regard establishes that they were actuated by no such motives.

Reverting again to the testimony of Weibell, the evidence shows that he again visited the ship shortly before 8 o'clock. On the occasion of this visit he found that the upper flame plate was completed to the point where the reaming of the dog holes was the next step. If the respondent's testimony is to be believed, and it is entirely incredible, this point was reached somewhere around 7 o'clock or a little after, and the four men had done nothing towards the completion of the work for approximately an hour except that Soell, the snapper, had attempted to repair a reamer. Undoubtedly trouble was had with the reamer, and it is natural to assume that Soell, who was doing no burning, would be engaged in an effort to get it ready for operation. However, considering the extent to which the work had progressed, the probabilities all favor that the burning continued while Soell worked on the reamer, and it was undoubtedly because there was burning yet to be done that the oxy-acetylene torch operator, Duplan, and his helper, Hebert, were left on board ship while Weibell and the other members of the night shift returned to the shop to secure a new reamer. If, then, it can be shown that the burning had not been completed up to the time of the fire, little weight is to be given to the further testimony of Hebert that he and

Duplan stopped work again as soon as Weibell left the ship.

It is clear from the record that new flame plates were being constructed and the former casing plates were being replaced. It also definitely appears that the nine holes in the new flame plate through which the bolts were to pass had been punched in the shop. Respondent's witnesses Kenney, Soell, and Weibell were also definite in their statements that the casing plate was ready to put up with nine holes in it, and these facts furnish the basis for respondent's assertion that there was no work to be done which required the use of the oxy-acetylene torch until the dog holes in the flame plates should be reamed out and the casing plate bolted to the flame plate with the nine bolts through the nine holes existing in both plates. However, at the trial the upper casing plate was offered in evidence, and it developed that, instead of there being nine holes through which the bolts could be passed, there were but three holes in the center of the plate; the other six holes having at some time been welded up. From this it would appear that it was subsequently discovered that the old bolt holes did not line up at the flame plate bolt holes; therefore, it was necessary to weld up two lines of the holes. In any event, the condition of the upper casing plate is mute evidence of the fact that there was burning yet to be done, for if the burning on the upper flame plate was completed there was no reason why the proper location of the six holes could not have been secured from the flame plate then in position and the burning of them completed. The argument of respondent that the torch was not used after 7 o'clock because there was no reason to use it falls of its own weight and is utterly refuted on the testimony of its own witnesses.

Consideration will now be given to the libelants' testimony. It is conceded by all parties that Miley, the fireman on the West Ira, discovered the fire. The testimony of Miley was first taken by deposition approximately ten months after the fire, and he testified that the Todd workmen were using their oxy-acetylene torch when he went into the fire room to light the center furnace of the port boiler, and that this was just a few seconds before he discovered the fire under the floor plates between the center furnace and port furnace of the port boiler. In his deposition he further stated that at times he had seen pieces of hot metal or sparks from the oxy-acetylene burner fall between the boilers on the tank tops and that just before

the fire the workmen were using the oxy-acet-ylene torch burning across the stage with the flame pointed downward. At the trial Miley testified that the torch was being used just a few minutes before he went in to light the center furnace and that prior to that time he had been absent from the fire room two or three minutes or possibly not that long. At another point in his testimony he stated that he could not recollect whether or not the torch was being used when he was in the fire room two or three minutes before the fire was discovered. The respondent makes much of the fact that Miley's court testimony is inconsistent with the testimony which he gave by deposition, but I do not regard this conflict as discrediting Miley's reliability as a witness considering that his testimony at the trial was given more than two years after the fire. Furthermore, he impressed me as being inherently honest, and for that reason I am disposed to accept as true the testimony which he gave when the matter was calculated to be fresh in his mind. The only other witnesses who had an opportunity to observe when the oxy-acetylene torch was being used were the first and third assistant engineers, and they both stated that on the evening in question they were working in the wing furnace of the center boiler putting in fusible plugs until 7:40; that the torch was then being used; and that the workmen stopped burning to permit them to get in and out of the boiler.

The situation thus presented is one involving the credibility of witnesses, and I am persuaded, after a careful consideration of the evidence in the light of all the surrounding facts and circumstances of the case, that the respondent's servants were not only using the oxy-acetylene torch at 7:40, but that they were actually using it up to a few seconds or two or three minutes before the fire.

It is next in order to determine whether the tank tops and floor plates were on January 9th littered with inflammable débris which was negligently left there by the respondent's agents. Before reviewing the evidence relating to the conditions that existed on that day, it is well to further consider the nature of the work that was being carried on under the repair contract. The contract called for the covering with asbestos of a large number of pipes and connections both in the engine room and fire room and also provided that canvas should be sewed around the asbestos covering. Among the pipes included was the main steam pipe and other pipes which ran across the top of the boilers, and of course over the space between them as well. The work required the removal of the old pipe covering which consisted of asbestos, muslin, and canvas and, necessarily, in carrying out this work pieces of canvas and scraps were dropped around in the locality of where the work was being done.

The testimony of Brown and Codling, port engineer and marine superintendent, respectively, for the operators of the West Ira, is to the effect that they visited the ship on the afternoon of January 9th and found the tank tops and floor plates in both engine room and boiler room littered with old pieces of canvas and old pipe covering. Ames, who is Codling's assistant, stated that he was likewise present at the time and he heard his superior reprimand the chief engineer and the first assistant because of these conditions. On the occasion of this visit, which was Codling's first visit to the ship, they witnessed the inspection of the center boiler and then Codling and Brown proceeded to the ship yard. Upon arrival they interviewed Hesley, respondent's vice president and general manager, complained to him of the conditions they had observed, and insisted that the débris be removed as provided for in the contract.

Hesley admitted that he received only one visit from Codling and Brown and there is no material dispute as to the conversation which ensued; however, he asserted most definitely that the call and subsequent conversation was on Friday, January 6th, three days prior to the fire. He further stated that the conversation was not held in his private office but in the office of his estimator, Stout, and that Stout, Meyer, and himself were all present. The testimony of Meyer and Stout is substantially in accord with that of Hesley, thus the only material issue between the two sets of witnesses is as to the date when the conversation occurred. Had matters stopped there and had this been the extent of the testimony on both sides, there may have been some doubt as to where the truth lay; but the record as made up leaves no room for doubt, and this will presently appear from a further analysis of the testimony. Hesley further stated that after Codling and Brown left on the afternoon of January 6th, he telephoned to Schuber, manager of the Eagle Asbestos & Packing Company, who immediately came over to the plant and he told Schuber that he must remove the débris. Schuber testified that after Hesley telephoned him on January 6th he went to the

plant, and that was the first intimation he had received from any one that it was part of his work as the subcontractor to clean up the débris; however, as the respondent was a good customer, he decided he would do the cleaning and the next morning he assigned two of his men to carry out the work. Santana, an employee of Schuber, stated that in compliance with the instructions which he received from his employer he spent a large part of Saturday removing the accumulation of débris both from the tank tops and the floor plates. As additional evidence that this cleaning work was done, Meyer further testified that on the day subsequent to the visit of Codling and Brown he visited the ship to see that everything was clean. He went into the engine room, glanced into the fire room, and found Schuber's men busily engaged in removing the débris. Later he saw on the wharf a mass of débris that had been taken from the ship, an amount which he estimated it took between two and three hours to remove. From this it would appear that there had been some substantial showing made that the débris had been cleaned up prior to the fire, but such is not the case as libelants' evidence irrefutably establishes the fact that Codling left New Orleans on the night of January 4th and stayed at the Jean Lafitte Hotel at Galveston until January 7th, returning to New Orleans on the morning of the 8th. The testimony of Codling with reference to his visit to Galveston was corroborated by the production of his expense account covering the trip in question, to which were attached the Pullman stubs bearing the Pullman date stamps as well as his hotel voucher at Galveston. In addition, the clerk of the hotel testified that he knew Codling, that he personally checked him in on his arrival and checked him out on his departure, and there was produced the hotel register for January 5th showing Codling's signature thereon. In the light of these startling disclosures, there is but one of two inferences that can be drawn; either the respondent's witnesses were mistaken, or they have consciously misstated the truth. In any event, the libelants' contention must prevail; therefore it is unnecessary for me to engage in the unpleasant task of sifting mistake of fact from conscious untruth in this mass of testimony. In any event, there can be slight doubt but that the chief engineer stated the whole truth when he said that he was in the boiler room the greater part of Saturday and he saw no one doing any cleaning up at all.

Further examination of the testimony bearing on this issue would appear unnecessary, as the evidence clearly warrants the conclusion that on the evening of January 9th the tank tops in the fire room of the West Ira were littered with old pipe-covering débris and pieces of canvas which resulted from the respondent's work and which it was under contract obligation to remove.

■ There remains for determination the last of the above points in issue, and this entails a consideration of the evidence by which the libelants seek to establish that the fire could not have been caused in any way other than by the negligent use of an oxy-acetylene torch. An examination of the photographs offered in evidence which depict the conditions that existed in and around the center boiler show that there were openings between the tool pan and the port side of the center boiler and the starboard side of the port boiler, and that these openings were sufficiently large to permit a small man to go through to the tank tops. There was also a small space between the tool pan and the lagging for the whole length of the boiler, and there were likewise openings to the tank tops around the manifold which was situated near the bulkhead directly in front of the center boiler. There is also substantial evidence in the record to show that there was ample opportunity for sparks to reach the tank tops between the center and port boilers where the torch was being used at the front of the center boiler. With reference to the tank tops on the West Ira, the testimony shows that they were continuous between the fire room and the engine room and were four feet below the floor plates. As is to be expected on all oil burning vessels, there was the usual accumulation of oil on the tank tops; and the bilges, according to Getchell, Evans, and Miley, were on the day of the fire nearly filled with water with a slight film of oil on top. These were the conditions that existed in the fire room on January 9th and were it not for the additional fact that the tank tops were littered with inflammable débris, no unusual fire hazard would have been presented in the use of an oxy-acetylene torch.

The evidence in the case at bar is all one way that sparks or molten metal falling on tank tops having a film of oil will not cause a fire and that the fire hazard only arises when the tank tops become littered with inflammable débris or material that can act as a wick. Under these circumstances the oil would be

heated and the fire soon spread over the tank tops and into the bilges. If, then, this accumulation of débris on the tank tops constituted a dangerous fire hazard, and the evidence is undisputed that if such a situation existed it was fraught with danger, the natural inquiry is to consider what precautions should have been taken to guard against the danger of fire and then what precautions were in fact taken by respondent's servants.

It was unquestionably the duty of the repairmen to secure full information as to the dangers presented, and this of course required them to examine into the condition in the bilges and on the tank tops to determine whether or not they were sufficiently clean. If they were not clean, they should have been cleaned and a man then given a bucket of sand or a fire extinguisher whose sole duty would be to watch the sparks and the molten metal. As a further precaution the repairmen should have placed a man with a bucket to catch the sparks, and it undoubtedly would have been good practice to have spread a piece of wet canvas between the boilers to guard the tank tops which were openly exposed.

Though their duty was plain, it is clear from the evidence that the respondent's servants took no precautions but proceeded to use the oxy-acetylene torch without examining the tank tops or looking into the bilges and without employing any of the usual and customary safeguards. This failure of duty on their part constituted gross negligence.

But pretermitting these negligent acts of omission which have been clearly shown, the respondent insists that a fire under the port boiler could not have been caused by a spark or molten metal reaching the tank tops between the center and port boilers, because the barrier interposed by the steel girder foundations of the boiler would not permit a spark to reach a point under the boiler. In my judgment it is not necessary to conjure as to what a piece of molten slag might do in hitting against various obstructions in order to meet this contention. It would appear a complete answer thereto to observe that if a spark ignited inflammable débris on the tank tops there was nothing to impede the progress of the fire from the point where it started, and its course naturally would be in the direction of the draft under the floor plates, which was toward the large open space between the port boiler and the skin of the ship. The fact, therefore, that smoke was first noticed under the floor plates of the port boiler is no indication that the fire was localized at that point. Miley, who was in the best position to observe, says the fire, as contradistinguished from the smoke, was between the center furnace and port furnace of the port boiler; his opinion being based upon his knowledge of draft conditions. However, all testimony on this point must be accepted subject to the qualification that no one in the fire room could see where a fire on the tank tops was burning except by looking down through the openings at the side of the boiler, and no one claims to have done this.

A considerable portion of this enormous record bears on respondent's theory that the fire on the West Ira was caused by burning oil finding its way to the tank tops from the port furnace of the port boiler. If there was any semblance of merit in this contention, I would feel disposed to devote some space to its consideration; but as it is clear from the testimony of respondent's own witnesses that this theory can neither be sustained in fact nor in the opinion of its experts there can be no necessity for further discussion. Sufficient, therefore, be it to say that I am of the fixed opinion that the operation of the port boiler could not possibly have caused the fire on the tank tops. With that possibility removed from the case there is but one conclusion that can be reached, and that is that the fire was caused through the negligent use by the respondent's servants of the oxy-acetylene torch. In my judgment the causal relation between the use of the torch and the fire on the tank tops has been established.

The conclusion thus reached necessarily precludes respondent's right to recover under its repair contract. Its claim for compensation for the service of a salvage barge has not been established and will be denied on the ground that it was the duty of the respondent to minimize the damage it had occasioned through the negligent acts of its servants.

An interlocutory decree may accordingly be entered in proceeding No. 19026 in favor of the libelant and the interveners, and against the respondent for the full damages sustained by them from the fire; together with interest and costs, with the usual order of reference to the commissioner to report the amount of libelant's and interveners' damages.

An interlocutory decree may also be entered dismissing proceeding No. 19084 with costs.

If it is not believed that this opinion is a sufficient compliance with Rule 46½ of the Admiralty Rules (28 USCA § 723), findings of fact and conclusions of law may be submitted; otherwise, this opinion will stand as, the findings of fact and conclusions of law in these cases and be deemed to constitute the formal decision thereof.