Alf A. JONES, Pauline E. Jones, W. B. Jones and Ann P. Jones, and Jack Jones Lumber Company, a Corporation, and Jack Jones Sash and Door Company, a Corporation, Appellants,

v.

GARNEY PLUMBING COMPANY, a Corporation, and Ernest Miller, Respondents.

No. 51779.

Supreme Court of Missouri,
Division No. 1.

Dec. 12, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied Jan. 4, 1967.

John C. Risjord and Gordon, Adams, Niewald & Risjord, Kansas City, for appellants.

David R. Hardy, Lane D. Bauer, Kansas City, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, of counsel, for respondents.

HIGGINS, Commissioner.

Action for $55,000 damages resulting from a fire at plaintiffs' lumberyard occupied in part by defendants. Plaintiffs appeal from judgment entered upon a verdict directed for defendants at the close of plaintiffs' case.

Plaintiffs based their action on *res ipsa loquitur* and alleged that on October 23, 1963, defendant Garney Plumbing Company was the lessor of a part of plaintiffs' premises, thus having complete and exclusive control and custody of a garage stall on plaintiffs' premises which they used to house and repair trucks; that defendant Garney was further in complete and exclusive control and custody of an acetylene torch used by defendant Ernest Miller as the agent, servant, and employee of defendant Garney in the maintenance of a truck; that, as a result of negligent handling and operation of the torch by Miller, a fire was started; that plaintiffs had no knowledge of the specific acts of negligence which caused the fire; that, as a result, plaintiffs sustained $50,000 damage to their property and $5,000 damage for interruption of their business.

Plaintiffs' buildings were located at 306 West 78th Terrace, Kansas City, Missouri. They consisted of two office buildings and two lumber sheds, 20 years old, used for lumber storage and as rental property. One office building containing four offices was located on the north side of 78th Terrace. Directly to the north were two lumber sheds which ran north and south, side by side, separated by an alley or aisle. Both sheds had large sliding doors on their east and west sides. The west shed was a 2-story wooden building 36 x 96 feet, with six stalls or bins each 16 feet wide. It had a concrete floor. Still farther to the north was the other office building. It faced on 78th

Street and was occupied by Alber Electric Company. On its south or rear side was a large overhead garage door which opened into the aisle between the lumber sheds. The first stall beginning at the south end of the west shed was used for storage of moldings and mahogany lumber. The second or next stall to the north of it was the one occupied by Garney Plumbing Company for storage and repair of trucks. The remaining stalls contained only lumber. There were no flammable liquids, solvents, or paint stored anywhere on the premises by the owners; there were no heating appliances in the west shed; and, prior to Garney's occupancy, there was no electrical service to the west shed.

In late September, 1963, Mrs. Garney and W. B. "Jack" Jones made arrangements for rental of the stall to Garney, including provision for installing electrical service. Robert Alber, journeyman electrician employed by his father, did the electrical work about October 10, 1963. To obtain electrical service he attached new wiring to an unused available fused circuit at the fuse panel on the south wall of the south office building and ran wire 15 to 16 feet aboveground to a service head at the Garney stall. Number 12 insulated wiring was used and enclosed in metal conduit. The installation included an electrical outlet and light in the Garney stall. A 4-inch steel box was used for the receptacle and it was located above the workbench in the southeast corner. An overhead light was installed using an octagonal metal box covered by a 4-inch porcelain receptacle, affixed to a ceiling joist. The switch was placed in the southwest corner at the west entrance. It, too, was enclosed in a metal box. Connections were made with screw terminals and splice nuts. When the job was completed Mr. Alber tested it and found it operating properly. According to him, the installation met approved standards.

Mr. Alber noted the location of the stall doors on the east and west sides. The doors were 12 to 14 feet wide, virtually as wide as the stalls. The north and south walls were of fiberboard and they contained no openings. The 7½ or 8-foot ceiling was made of wood decking over wood joists. Approximately six days before the fire, Mr. Alber was in Garney's stall and noted oil spots on the floor where trucks had stood. There was some grease on the floor, and there was a pan of solvent, presumably gasoline, for cleaning truck parts, on the floor at the west end of the workbench. There were some shop towels and rags lying about and the stall had the appearance of a shop used for repairing trucks. Mr. Miller was present at the time of this visit.

By way of deposition, Ernest M. Miller testified that he had worked as a mechanic at the lumberyard stall for two or three weeks before the fire. During that time he worked on several Garney trucks. He had grease rags and a five gallon can of gasoline which he had used to wash grease from engine parts. He did not keep his gasoline can in any particular place. He overhauled truck engines and the trucks dripped grease and oil onto the floor. In overhauling engines, he would take them apart and that also produced grease and oil. Although he had a box for grease rags, he did not have a container for trash or any compound or material with which to clean up grease. He also performed cutting and welding operations in the stall. The acetylene equipment he used included oxygen and acetylene bottles with rubber hoses connecting them to his torch. Each bottle had a valve and a gauge, both of which operated easily with a wrench. He wore protective goggles but did not use asbestos gloves, nor were there any guards, shields, or other devices to protect against hot metal sparks which resulted from cutting operations and can fly as much as 8 or 10 feet. Mr. Miller never experienced any difficulty with any of his electric equipment or supply prior to the fire. On the morning of the fire he was at work at 6:15 and was the only person employed there by Garney to work on trucks. His acetylene torch equipment was on the premises, including oxygen

and acetylene bottles, torch, rubber connecting hoses, valves and gauges. He customarily did not work with the light on and did not turn it on this morning. He worked by the daylight from the open doors which were approximately 12 x 18 feet. He had his electric impact wrench plugged in; he had no other electric appliances that day. The wrench worked properly and he had no electrical shorts or sparking. Defendants admitted that Mr. Miller's work on that date was in the scope of his employment; they denied he used his torch on that day.

Mrs. Evelyn Alber did general office work, including typing and invoicing, for Alber Electric Company which was owned by her husband, Dan R. Alber. She knew Ernest Miller and knew about acetylene torches, having seen her husband use one in his business. She had seen Mr. Miller using an acetylene torch in the Garney stall in the repair of and to burn paint off Garney trucks. She described Miller's equipment as two bottles of gas and a torch about 12 inches long. On the morning of October 23, 1963, the day of the fire, Mrs. Alber drove along the west side of the shed and noticed a Garney truck in the Garney stall but did not see Mr. Miller. She arrived at her office about 8:50 A.M., made a pot of coffee, and sat down at her desk. The overhead garage door at the back of her office building was the nearest part to the west shed. To the north of that door was a garage, the length of which was at least that of two trucks. The garage was then separated from the office proper by a wall with a door in the center. Mrs. Alber's desk was about four feet north of that wall facing east and west. She was in a direct line with the door in the wall to the garage. She sat at her desk in a swivel chair which enabled her to look out the garage door and then on to the south through the overhead door. On occasions previous to the fire she had looked out those doors in this manner and had seen Mr. Miller using his torch at the Garney stall. She had never seen anyone except Miller using a torch there.

As Mrs. Alber looked out the doors on this morning, there was a truck in the center of the aisle between the sheds, a truck in front of the Garney stall facing south on the east side, a car facing north alongside the office building, and a house trailer parked in the aisle. According to her, none of these vehicles interfered with her line of vision to the Garney stall. She could see its east side but not into it. While looking toward the Garney stall, Mrs. Alber saw a man's arm, slightly bent, point an acetylene torch out of the east side of the Garney stall, presumably to adjust it. The flame was at first about 12 inches long, yellow in color, and changed to a shorter flame, bluish in color. Her observation took "a second or two," and when she glanced away to pick up her coffee, the torch "disappeared" into the stall still flaming. Mrs. Alber began typing an invoice and after a short time, two to ten minutes, heard a cracking, jumped up and went back to see what was going on. She saw fire at the rear of the Garney stall with flames coming from the stall. There were no flames coming from the stalls on either side of the Garney stall. She ran back and called the fire department and learned that the fire had already been reported. She ran back outside to start moving cars and saw Mr. Miller on the west side of the shed. She shouted at him to help her, but "he was kind of berserk * * * he was excited too, and he just mumbled and turned around and ran back * * * towards the south." She moved one car and then a fire truck arrived. The wind was brisk to the north and blew the fire toward her. She observed that the south stall was a most destroyed area but had not looked closely enough to determine if it was more so than the Garney stall.

Robert Alber testified that the rear door of Alber Electric was nine feet wide and said that if it were open a person seated at the desk where Mrs. Alber sat could

see the east side of the west shed and could observe a man sticking his arm out of the shed holding an object.

Harold L. Perdue was an employee of Jack Booth Construction Company which had an office in plaintiffs' south office building. He heard a commotion, ran outside and around the west end of the office building and saw fire in the area where the south stall of the west shed met the office building. He changed direction and met Mr. Miller near the east end of the office building. Mr. Miller told him that he had been working under the truck and all of a sudden there was a "poof" and a fire started.

Harry O. Phipps, fireman of 13 years' experience with the Kansas City Fire Department, received an alarm October 23, 1963. His station was one block from the fire and he proceeded there immediately in his pumper truck, arriving at the west side of Alber Electric Company and facing south within one minute after the alarm was received. "As we pulled up there we seen a small fire just approximately a little bit halfway past the middle of the building, about a foot and a half above the ground." He circled that area on a photograph in evidence and related it to the location of a truck in the Garney stall. "The area most severely burned out is around the truck." As soon as he arrived and started his pumper, there was a "rumble" and "the whole building erupted in flame." The wind was from the southwest and brought the fire directly toward him. Around 3 P.M., as the fire was dying, "a Garney flat bed truck backed in and loaded two acetylene tanks onto the truck and drove off." After the fire was over he determined that the point where he first saw the small fire "proved to be just straight behind the truck," referring to the truck burned in Garney's stall.

Joseph E. Thomas, with 18 years' experience in automobile garage and body work and in the use of acetylene torches, described the principle of combining

acetylene gas with oxygen to generate heat. The torch unit consists of oxygen and acetylene gas with oxygen to generate heat. by a hose. The same torch handle serves for both cutting and welding, using only a different tip for each process. The torch is lighted by use of a flint scratched on a metal surface and, after the acetylene is lighted, oxygen is added by regulation of the valves at the torch handle base. Initially the flame is yellowish white and, upon adjustment, feather edges to a bluish point. In the cutting process the torch heats the metal to a melting point and oxygen jets in the torch tip blow the molten metal "out of the road * * * like a sparkler or some effect—just a bunch of sparks flying from it. * * * According to the type metal that you are using, some will fly as far as two feet and others will fly over—maybe a foot and a half."

There was evidence to show $34,050 damages to plaintiffs' buildings and a loss of lumber worth $21,135 as a result of the fire.

■■■ The only issue is whether plaintiffs made a submissible case, that is to say, did plaintiffs have sufficient evidence to prove that defendants' use of an acetylene torch caused the fire on plaintiffs' premises? They must have proof of this question in order to establish a basis for an inference of defendants' negligence under the *res ipsa loquitur* doctrine, Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S.W.2d 506, 510 [12], Gateway Chemical Co. v. Groves, Mo., 370 S.W.2d 302, Holloway v. Skelly Oil Co., W.D.Mo., 68 F.Supp. 129, 130 [2], Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W.2d 599, 601–602 [1–3]; and, in this determination, all the facts and circumstances favorable to plaintiffs and the reasonable inferences which can be drawn are to be considered. Christie v. Gas Service Co., Mo., 347 S.W.2d 135, 137 [1]. The doctrine is, of course, applicable to operation of an acetylene torch as a cause of fire, Gateway Chemical Co.

v. Groves, Mo., 338 S.W.2d 83, 86 [1, 2]; and, as in any case sought to be made on circumstantial evidence, the circumstances must give rise to an inference of negligence which reasonably follows without guesswork or speculation. Williams v. Cavender, Mo., 378 S.W.2d 537, 541 [2]; Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663, 670 [8]; Bates v. Brown Shoe Co., 342 Mo. 411, 116 S.W.2d 31, 33 [1]; Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541, 547 [2].

From the stated evidence a jury would be warranted in finding that Mrs. Evelyn Alber, on October 23, 1963, while at her desk, saw Garney's employee, Ernest Miller, point an acetylene torch outside the door of Garney's stall, adjust it from a yellow to a bluish flame, and take it back into the stall while still aflame. She had seen Miller there before and he admitted being on the premises on that morning, together with his acetylene equipment. He was the only person employed there by Garney and admittedly his use of an acetylene torch was a regular part of his work and within the scope of his employment. The jury would be further warranted in finding that Mrs. Alber saw fire "at the rear of the Garney stall" within ten minutes after seeing the torch adjusted and taken back into that stall, and she saw no flame at the stalls on either side of Garney's.

Fireman Phipps also located the point of origin of the fire as being in the Garney stall behind the truck found there after the fire. His first observation of fire was that of a small fire about a foot and a half above the ground and he located this point in relation to the truck found burned in Garney's stall. According to him the Garney stall was the most burned out area.

The Garney stall was but 16 x 36 feet, used for mechanic work and maintenance, and Mrs. Alber had seen a torch used there in repair and burning paint from trucks on previous occasions. Prior use of the torch for both cutting and welding was admitted by Miller and he stated that sparks could fly as far as 8 or 10 feet. Robert Alber observed a pan of solvent near Mr. Miller's workbench about six days before the fire and Miller admitted that he kept gasoline there to clean grease from engine parts. Grease and oil were also observed on the floor, together with grease cloths and rags, and no material was kept for cleaning grease from the floor. Miller's work of overhauling engines required the use of solvent and rags, and grease and oil dripped on the floor as a result of the work. The presence of all such items a few days before the fire, the need for them in mechanic work performed there, and the admission of mechanic work being performed on October 23, 1963, would warrant an inference that there were flammables present in the stall on that date which could be ignited by a spark of molten metal flying from use of the acetylene torch. The inference is further supported by the evidence that fire was seen at the Garney stall a short time after a torch was seen in a lighted condition there; that he worked alone in a wooden building, and was heard by Harold Perdue to say immediately after the fire started that he was working under a truck and that there was a "poof" and the fire started. Such facts point in the same direction as Mrs. Alber's having seen the torch and shortly thereafter the fire, and they are inconsistent with the theory of a slowly kindled fire resulting from an electrical short as suggested by defendants. Mr. Miller's statement to Perdue was a graphic description of what happens when vapor from gasoline or other solvent is ignited by a torch, spark, or other fire. And it is consistent with Fireman Phipps's observation of a small fire and then a "rumble" after which the building was engulfed in flames.

■ Defendants' argument suggests a fire starting in the stall south of Garney's and electricity as a possible cause of fire. However, the west shed contained only lumber and had no electrical supply or ap-

pliance except that in the Garney stall, and the evidence was that the electric installation there was accomplished by approved techniques and materials and it tested satisfactorily. Miller had not had any shorts or electrical sparks, his light was not switched on, and his electrical impact wrench functioned properly. There had been no inflammables anywhere on the premises other than in Garney's stall and Fireman Phipps placed the origin of the fire in the Garney stall. Consequently, it would be reasonable for a jury to infer from this and the other evidence that Miller's torch used in defendants' business caused the fire; and even though fire is not ordinarily started by operation of an acetylene torch where the operator uses due care, Gateway Chemical Co. v. Groves, supra (338 S.W. 2d 83), once there is evidence to warrant finding a causal connection between operation of the torch and a resultant fire, the res ipsa loquitur doctrine raises the inference of negligence and it is not necessary for a plaintiff to go further and exclude every other reasonable theory of nonliability on the part of a defendant. Adam Hat Stores, Inc. v. Kansas City, Mo., 316 S.W. 2d 594, 600[7].

This case is similar to other cases held to be submissible under circumstantial evidence of operation of a torch in proximity to flammables located in an area where a fire starts. In Matthews v. Carpenter, 231 Miss. 677, 97 So.2d 522, plaintiff's truck was burned in an automobile repair shop fire. The owner's employee had been using an acetylene welding torch within four or five feet of the door of a paint shop where a paint spray gun was being used. The welder left for a short interval, after which the paint shop was found to be afire. These circumstances supported a reasonable and logical inference that fire from the welding torch ignited inflammable mist in close proximity and set off the fire. It appears that the defendant owner admitted that his employee had been using his torch, thus clearly raising a jury issue of causation. However, this would merely ease a plain-

tiff's burden of proof rather than to constitute a distinction from this case where the evidence supports a reasonable inference that defendant Miller was using an acetylene torch. In Lawrence Warehouse Co. v. Defense Supplies Corp., 9 Cir., 164 F.2d 773, plaintiff's goods were damaged by a fire in defendant's warehouse. Against appellant's contention that the evidence was insufficient to support a finding for plaintiff, the court accepted "as true the finding that the fire originated from the use by McGrew (defendant's employee) of an acetylene torch in the cutting up of a steel tank in the engine room. The sufficiency of the showing to this effect is hardly open to debate." 164 F.2d l. c. 775[1]. The circumstances which supported the finding and quoted observation were that McGrew took his acetylene torch to defendant's premises on the day preceding the fire for the purpose of cutting up a tank in the engine room. The task was resumed the next morning and shortly after noon a fire broke out near the operation. "There was evidence of the presence of some dark substance on the floor at the corner of the tank. * * * No precautions were taken in the way of providing fire fighting equipment with which such a fire as the torch started could have been put out. This, too, in a structure in which valuable and highly inflammable material was stored * * *" (164 F.2d l. c. 776), and it was not shown what material was kindled by the torch. Such circumstances do not appear as convincing and persuasive as those in support of the present case. The fire in John Rooff & Sons, Inc. v. Winterbottom, 249 Iowa 122, 86 N.W.2d 131, was alleged to have been started by an acetylene torch in a res ipsa loquitur pleading. Leo Rooff inspected the building before the torch work commenced. Some cardboard cartons were removed near the wall where the cutting was to be done. They had a fire extinguisher but left it in their truck. Soon after use of the torch began, the operator set fire to a bird's nest underneath the roof which the operator put out with his gloved hand. Leo then went to an office building

to get an extinguisher and when he returned he saw a grass fire beneath where the torch was being used which destroyed the building. A finding was warranted that sparks from the torch, soon after setting the bird's nest afire, fell on dry grass and set fire to the building and contents, thus creating a jury question of whether the fire was caused by negligent operation of the torch under the circumstances. The apparent admissions of use of the torch and where the fire started merely simplified the burden of proof and do not serve to distinguish the case.

■■ Generally, mere occurrence of fire does not raise a presumption of negligence or cause of fire, Gateway Chemical Co. v. Groves, supra, 370 S.W.2d 1. c. 304[1]; Craddock v. Greenberg Mercantile, Inc., supra, 297 S.W.2d 1. c. 547[3]; Kansas City Stock Yards Co. v. A. Reich & Sons, Mo., 250 S.W.2d 692, 700[16]; Hendricks v. Weaver, Mo., 183 S.W.2d 74, 76[2]; however, the fire on plaintiffs' premises was, in itself, an important circumstance to be considered in this circumstantial evidence case. Citizens Bank of Festus v. Missouri Natural Gas Co., Mo., 314 S.W.2d 709, 714 [3], 72 A.L.R.2d 855. In the last case plaintiff claimed a faulty furnace started the fire. There was evidence that it had not been operating properly necessitating a number of service calls; that the most intense part of the fire was in the room where the furnace was located, and the fire burned the ceiling and roof immediately above it. Defendants' theory was that the fire was started by defective wiring east of the heating unit and burned under the floor to the room where the unit was located. The latter possibility was held not to prevent a jury from inferring from all the evidence that the fire was triggered by an overheating furnace. In United States v. Todd Engineering Dry Dock & Repair Co., Inc., E.D.La., 53 F.2d 1025, and International M. M. S. S. Co. v. W. & A. Fletcher Co., 2 Cir., 296 F. 855, there was no direct evidence that the torch alleged to have been used set the fires but the courts permitted such an inference from proof tending to show use of a torch in proximity to inflammable materials. See also Hardwick v. Kansas City Gas Co., 355 Mo. 100, 195 S.W.2d 504, where circumstantial evidence that an explosion was caused by a break in defendant's 4-inch gas main 42 feet away from the center of the explosion was sufficient for a jury to consider although there was evidence, some by experts, of other causes.

Respondent relies heavily on Gateway Chemical Co. v. Groves, supra, 370 S.W.2d 1. c. 304[2, 3] which set out general rules covering liability for fires set by torches taken from 49 A.L.R.2d 369, 371, 374: "It has frequently been held or recognized that liability may be imposed upon the user or his employer for injury or damage resulting from fire started by the use of a blowtorch, at least upon a showing of negligence on the part of such user or his employer, but that there is no liability in the absence of negligence. * * * However, the user of a blowtorch or his employer is not liable for injury or damage caused by fire, in the absence of sufficient proof of causal connection between the use of the torch and the fire. * * * However, the use of a blowtorch prior to a fire does not result in liability for injury or damage caused by the fire, in the absence of negligence on the part of the user of the torch." And in considering the evidence permitting applicability of *res ipsa loquitur*, "Ultimately the problem * * * is whether 'there is anything indicating the defendant's business was being conducted at the time other than in the usual manner; and there is nothing to show the equipment was defective, the surroundings faulty, or that the accident otherwise was prima facie due to the defendant's negligence.'" 370 S.W.2d 1. c. 305[5–6]. See also Hendricks v. Weaver, supra. The court applied the foregoing criteria to determine that there were no facts or circumstances from which the jury reasonably could infer that a torch caused the fire, other than the fire itself in the general area where the torch was used;

however, the circumstances there distinguished that case. Gateway claimed that the fire was in the northwest corner of the basement in the vicinity of the boiler; defendants claimed it was first seen and originated underneath a stairway in a portion of the building under control of plaintiff where rags, paint, etc., were stored. Defendant's boilermaker admittedly used a torch inside the steel boiler of the heating plant enclosed in a brick boiler room. And he used a shield against the "dingle berries" from his cutting torch. Thus, there was no showing of lack of care or other improper action by the torch user, and the area where flammables were kept where some said the fire started was an area away from the boiler under control of plaintiff. Under those circumstances the inferential gap could be supplied only by guesswork and conjecture.

Respondent's other citations are generally distinguishable in that they did not involve torches. Hendricks v. Weaver, supra, is also subject to distinction on other facts. Plaintiffs' theory was that defendants negligently allowed a heater to explode and burn the premises resulting in the death of plaintiff's daughter and the question was whether the evidence showed the origin of the fire. There was evidence that the fire was first discovered in the vicinity of a front stairway but there was no evidence permitting an inference of fire in the office where the stove was located or that the fire started from the stove. So also may Craddock v. Greenberg Mercantile, Inc., supra, be distinguished because plaintiff's theory that a furnace exploded and caused the fire was completely unsupported where the only evidence was that a damper was found 17 feet from the furnace a week after the alleged explosion. Highland Golf Club, etc. v. Sinclair Refining Co., N.D.Iowa, 59 F.Supp. 911, failed of submission because there was no evidence such as spilling or overflowing of gasoline at the site of a storage barrel from which to infer a fire having started there rather than at some other place in the basement room. Holloway v. Skelly Oil Co., supra, involved an unproved allegation of specific negligence respecting an explosion alleged to result from a leaking gas main. So also was Kansas City Stock Yards Co. v. A. Reich & Sons, supra, a specific negligence case. It involved use of an arc welder on the truck bed and fire found at the truck cab. A verdict for defendant was affirmed, but of further interest is that even though there was no evidence of someone actually seeing sparks from the torch ignite the fire, the court did not question submissibility.

Respondents say that plaintiffs' case must stand, if at all, on the testimony of Mrs. Alber, and assert her testimony to be so "indefinite, unclear, uncertain, contradictory and incredible that it is not substantial evidence, has no probative value and cannot contribute toward making a submissible case."

■ Substantial evidence is, of course, necessary to a submissible case, Boring v. Kansas City Life Ins. Co., Mo., 274 S.W.2d 233, 238[6], Clymer v. Tennison, Mo.App., 384 S.W.2d 829, 834[3], Probst v. Seyer, Mo., 353 S.W.2d 798, 802[1; 2]; and "forced and violent inferences should not be indulged," Davidson v. Hennegin, Mo., 304 S.W.2d 836, 839[1–3].

Respondents' contention is that there is not substantial evidence to prove that Mrs. Alber saw fire coming from the Garney stall and nowhere else, and point to certain excerpts from her testimony which they suggest demonstrate such conflict, contradiction and irreconcilability as to be destructive of probative value of her testimony. Pritt v. Terminal R. R. Ass'n of St. Louis, 359 Mo. 896, 224 S.W.2d 119, 123[3]; Adelsberger v. Sheehy, 322 Mo. 954, 59 S.W.2d 644, 647[6, 7]; Stephens v. Thompson, Mo., 293 S.W.2d 392, 394 [1, 2]; Missouri Interstate Paper Co. v.

Gresham, 233 Mo.App. 5, 116 S.W.2d 228, 230[6]; Brosius v. Weber, 149 Mo.App. 181, 130 S.W. 134, 135. On direct examination she said she first saw "a fire at the rear of the Garney stall," and answered that there was no flame coming from the stalls to the south and to the north of Garney's stall. Upon cross-examination she stated that after calling the fire department she came back out and "it was all in flames." "Q It was all in flames the first time you saw it, wasn't it? A It was not all in flames, not every bit of it. Q Well, what was in flames then * * *? A All right, there was the catwalk above the door * * * of the Garney stall, and along the floor, and it was just racing up * * *. Q Now on page 10 of your deposition the answer I read you a moment ago where you say 'I ran out to the back and everything was on fire out there?' A I was excited; so you get excited, so you say 'everything is on fire,' maybe I mean two feet of fire, maybe I meant five feet of fire, I don't know. Q * * * Did you mean two feet of fire or everything was on fire out there? * * * THE WITNESS: The back end of the Garney stall was all on fire, the east side of it, and I ran back in to call the Fire Department, when I went back out everything was on fire. Q * * * I see, now why was it then on page 10 and in response to Mr. Risjord's last objection, why was it that you didn't say about running out and seeing the Garney stall and then running back in and calling the Fire Department and then seeing everything on fire? A I wasn't looking at any one stall. I just said the Garney stall, which the door was open, that was where the fire was coming out." Similar suggestion is made in respect to three statements taken from Mrs. Alber by respondents. The statements contain information in the same general tenor as the foregoing testimony and, for that reason, they need not be set out in detail.

Examination of the excerpts and the statements shows the witness to have consistently described the first fire or flame seen as coming from the rear or east side of Garney's stall. Later on, it was "racing up" toward the catwalk above the stall and, obviously, the whole shed was quickly and ultimately engulfed in flames. The excerpted testimony shows also that even though pressed upon lengthy cross-examination, the witness remained steadfast in her description of the first fire seen coming out of the Garney stall.

 Nor does the case hang on her testimony alone, because Fireman Phipps corroborated her in locating the first fire he saw as a small flame just aboveground at a point directly behind the Garney truck in the Garney stall. He also stated this to be the area of the heaviest burning, indicative of the origin of the fire. She was also corroborated by Robert Alber in respect to her ability to see Garney's stall when seated at her desk. Under these circumstances, it cannot be said that Mrs. Alber's testimony was plainly self-destructive, and variances, if any, were for the jury in determining the weight and credibility to be given her testimony. Statler v. St. Louis Arena Corp., Mo., 388 S.W.2d 833, 835[2].

Appellants also charged error in respect to refusal of an offer of proof. It is unnecessary to consider that charge because it has already been determined that plaintiffs made a case, and the matter may not present itself in the same manner upon retrial.

Reversed and remanded.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.