Eli BYRD, Ruby Byrd, Ella Mae Byrd, Dave Carter and Alberta Carter, Plaintiffs-Respondents,

v.

James BROWN, Charles Jacks and the City of Cabool, Missouri, Defendants-Appellants.

No. 12378.

Missouri Court of Appeals, Southern District, En Banc.

Oct. 6, 1982.

164

Gary T. Nelms, Mark L. McQueary, Jones, Keeter, Karchmer, Nelms & Sullivan, Springfield, John Alpers, Jr., Cabool, for defendants-appellants.

Michael L. Shortridge, John D. Eakes, Shortridge & Eakes, Willow Springs, for plaintiffs-respondents.

HOGAN, Judge.

This is a second appeal in the same case. See *Byrd v. Brown,* 613 S.W.2d 695 (Mo.App.1981). Our jurisdiction is challenged by plaintiffs' motion to dismiss the appeal. To preserve some sense of coherence in the opinion, we must first consider the present state of the record, bearing in mind that all matters directly or inferentially decided on the first appeal have become the law of the case unless the former ruling was palpably wrong or there has been a substantial change in the facts. *Lonnecker v. Borris,* 245 S.W.2d 53, 55[1] (Mo.1951); *Norris v. Bristow,* 361 Mo. 691, 699, 236 S.W.2d 316, 319[1], 26 A.L.R.2d 366, 370–371 (1951). We adhere to our former ruling; there has been no change whatever in the facts. The principle called the "law of the case" applies.

Plaintiffs averred in their petition that on January 17, 1977, employees of the City of Cabool negligently set fire to plaintiffs' building, causing damage to the building and its contents. The cause was tried to the Circuit Court of Texas County, sitting without a jury, on November 17, 1978. Honorable Weldon W. Moore, a regular judge of the 25th Judicial Circuit, presided. At the conclusion of the trial, Judge Moore made a minute entry upon his docket sheet.

If this docket entry—which we shall presently set out at length—is regarded as a judgment, plaintiffs Byrd had judgment against all three defendants in the amount of $45,723.00 on November 17, 1978.

Upon notice, but without an opportunity to be heard, Judge Moore made the following minute entry on November 20:

"Court of its own motion sets aside the judgment in favor of Eli Byrd, Ruby Byrd and Ella Mae Byrd and against James Brown, Charles Jacks and the City of Cabool as defendants and grants a new trial. Court also on its own motion sets aside the judgment in favor of defendants and against Dave and Alberta Carter on their claim for loss of profits and plaintiffs Dave and Alberta Carter granted a new trial. Judge Weldon W. Moore disqualifies and transfers cause to Division I where Judge Northern sits."

Thereafter, Judge Moore made some further entries in the docket, all attempting to grant defendants a new trial. On December 7, 20 days after the court made its original entry, plaintiffs filed a motion to vacate the order of November 20 on the ground that counsel had notice of Judge Moore's intention to grant a new trial but were afforded no opportunity to be heard. The motion was addressed to Judge Eugene E. Northern, the other regular judge of the 25th Circuit, but Judge Moore's actions taken after November 20 prevented the motion's being heard. Plaintiffs then sought relief by prohibition. The writ was denied here and by our Supreme Court which, however, denied the writ without prejudice to plaintiffs' right to appeal to this court. Plaintiffs appealed. The court held, inferentially at least, that the trial court's minute entry is a final judgment if the entry is complete enough to constitute a final determination of the rights of the parties. *Byrd v. Brown,* supra, 613 S.W.2d at 698–699[6–8]. The notice of appeal was directed to an order granting a new trial made on December 16, 1978, but this court, in the discharge of its duty to dispose finally of the case, Mo.R.Civ.P. 84.14 (12th ed. 1981), held that the order of November 20 was invalid be-

cause plaintiffs had been afforded no opportunity to be heard and further held, upon the authority of *State ex rel. Peabody Coal Co. v. Powell,* 574 S.W.2d 423 (Mo.banc 1978) and *State ex rel. Ellis v. Creech,* 364 Mo. 92, 259 S.W.2d 372 (banc 1953), that having disqualified himself, Judge Moore was bound to surrender jurisdiction and all orders entered *after* November 20 were invalid. *Byrd v. Brown,* supra, 613 S.W.2d at 699–700[9–11]. Our mandate ran on April 2, 1981, and read as follows:

> "On this day, the Court, being sufficiently advised of and concerning the premises, does consider and adjudge that the order of December 16, 1978, rendered herein by the Circuit Court of Texas County be reversed, annulled and for naught held and esteemed."

Thereafter, the trial court entered a formal judgment as a separate document on May 22, 1981. The judgment simply recites the findings made by the trial court on November 17, 1978. On June 5, 1981, defendants moved this court for an order permitting a late notice of appeal. Leave was granted, subject to a determination whether the appeal was timely.

Maintaining the court has no jurisdiction of the appeal, plaintiffs argue that the trial court's minute entry dated November 17, 1978, was a judgment; that 30 days thereafter it became a final and appealable judgment; that all orders made thereafter were void; that the record stands as if the trial court had never acted after November 17 and therefore on June 17, 1979, 6 calendar months after the judgment became final and appealable, this court lost jurisdiction to grant leave to appeal by special order pursuant to Mo.R.Civ.P. 81.07(a) (12th ed. 1981). We are cited to *Caldwell Paint Mfg. Co. v. Lebeau,* 591 S.W.2d 1 (Mo.App.1979), in support of plaintiffs' argument concerning the state of the record, and if plaintiffs are correct, we cannot entertain this appeal, even if we suspended the rules or the parties agreed to submit the appeal. *Foster v. State,* 590 S.W.2d 912 (Mo.banc 1979); *State v. Lindner,* 498 S.W.2d 754 (Mo.banc 1973).

Defendants respond with the argument that the minute entry of November 17, 1978, was in no sense a "judgment" and therefore there was no judgment until the trial court entered its formal judgment on May 22, 1981. In support of this argument, defendants cite *Elmore v. Whorton,* 581 S.W.2d 950 (Mo.App.1979); *Cornelius v. Tubbesing,* 576 S.W.2d 753 (Mo.App.1979); *Gray v. Bryant,* 557 S.W.2d 489 (Mo.App. 1977); *Corley v. McGaugh,* 555 S.W.2d 376 (Mo.App.1977); *Riverside Chemical Co. v. Hawkins,* 555 S.W.2d 369 (Mo.App.1977); *Cochran v. DeShazo,* 538 S.W.2d 598, 600–601[5, 6] (Mo.App.1976); and *Williams v. Williams,* 480 S.W.2d 525 (Mo.App.1972). In addition, counsel might have cited *Byrd v. McGinnis,* 299 S.W.2d 455, 460[7] (Mo. 1957) and *McCoy v. Simpson,* 344 Mo. 215, 217, 125 S.W.2d 833, 834[1] (1939).

To consider the question of jurisdiction, specifically whether the appeal is timely, we must resolve a number of questions, not necessarily as tendered by the parties.

■ The first of these questions is whether a minute or docket entry may constitute a judgment. The answer is: Most certainly. The act, after the trial and final submission of a case of pronouncing judgment in language which fully determines the rights of the parties to the action, and leaves nothing to be done except the entry of the judgment by the clerk, constitutes the rendition of the judgment. *State ex rel. Green v. Henderson,* 164 Mo. 347, 360, 64 S.W. 138, 141 (banc 1901); *Byrd v. Brown,* supra, 613 S.W.2d at 698–699 and cases cited n. 3. And, as stated by our Supreme Court in *Fleming v. Clark Township of Chariton County,* 357 S.W.2d 940, 942 (Mo.1962):

> " 'The entry or recording of the instrument does not constitute an integral part of, and should not be confused with, the judgment itself. Consequently, the judgment itself is not that which may be entered or recorded, but that which is considered and delivered by the court. . . .' "

So, rescription of a docket entry onto a separate paper or into a "firmly bound

book" effects no transmutation from "docket entry" or "mere" docket entry into a judgment.

A word of caution is appropriate. The general rules just cited furnish neither an infallible guide nor specific criteria by which to determine whether a particular, specific writing is a judgment sufficient to support an appeal. Even very careful students acknowledge that "There can be difficulty in identifying, in a purely mechanical sense, what is the final judgment." F. James and G. Hazard, Civil Procedure, § 13.4, p. 670, n. 2 (2d ed. 1977). In the absence of a rule requiring the judgment to be a separate document, the sufficiency of a particular writing to support an appeal is, and will continue to be the subject of apparently conflicting rulings. See: 11 C. Wright and A. Miller, Federal Practice and Procedure §§ 2781, 2782 (1973); Annot., 73 A.L.R.2d 250 (1960). We have examined the precedents carefully; the only useful rule of thumb we have found is that laid down in *Magee v. Mercantile-Commerce Bank & Trust Co.,* 339 Mo. 559, 561, 98 S.W.2d 614, 616[4] (1936): We should "[overlook] the omission of mere matters of form and [hold] that [the] judgment is sufficient to support an appeal 'when it appears to have been intended by some competent tribunal as the determination of the rights of the parties to an action, and shows in intelligible language the relief granted.'" See also *Stith v. J.J. Newberry Co.,* 336 Mo. 467, 495, 79 S.W.2d 447, 461 (1934). We bear in mind that our Supreme Court may have intended its Administrative Rule 4, particularly § 4.12[1] to require that the judgment be entered as a separate document, as does Fed.R.Civ.P. 58(2). That rule, however, has not yet been authoritatively construed, and this court has neither the authority nor the inclination to attempt such a construction.

The particular minute entry—or judgment—in question here was governed by the provisions of Mo.R.Civ.P. 73.01 (9th ed.

1978). Rule 73.01.1(b) then provided that "The court shall *render* such judgment as it thinks proper under the law and the evidence...." Rule 73.01.1(c) provided: "Not later than 15 days after the *entry* of judgment, a party may, but need not, file a motion for new trial ...." (Our emphasis.) So, as with the code section which the rule replaced, the key and operative words are *render* and *enter.* In *Woods v. Cantrell,* 356 Mo. 194, 200, 201 S.W.2d 311, 315 (1947), the court held that in a court-tried case, judgment is both *rendered* and *entered* and is effective for all purposes from the time a minute entry sufficient to support a judgment is made.

The trial court's order of November 17, 1978, read as follows:

"Parties appear with their attorneys and announce ready for trial. Jury waived. Depositions ordered opened. Plaintiffs offer evidence and rest. Defendants offer evidence and rest. Both sides rest. Issues found for plaintiffs Eli Byrd, Ruby Byrd and Ella Mae Byrd and against defendants and plaintiffs recovery fixed at $5,723.00 for damage to building and $40,000 for contents. Issues found for defendants and against plaintiffs Dave Carter and Alberta Carter on their claim for loss of profits."

■ This entry reflects that the parties appeared in person and by attorney; that the case was tried to the court and finally submitted; that the issues were found for plaintiffs Byrd and their damages were assessed at $45,723.00 and that the issues were found against plaintiffs Carter and for defendants on the Carters' claim. The entry clearly appears to have been intended by a competent tribunal as a determination of the rights of the parties to the action and shows in intelligible language the relief granted. The entry of November 17, 1978, was a judgment; the time for post-trial motions and for computing finality for purposes of appeal ran from the day of entry.

1. Which reads: "The court shall approve the judgments in all civil and domestic relations cases. The court shall be responsible for all judgments, allocutions and sentences in criminal cases. *The judgment shall be a part of the respective case files."* (Our emphasis.)

Is this case then so like *Caldwell Paint Mfg. Co. v. Lebeau,* supra, 591 S.W.2d 1, that we must regard the judgment of November 17 as having been a present, existing judgment from the time it was entered? We think not. In *Caldwell,* the court held the order granting a new trial was void. It did not go further and consider whether the judgment originally rendered was effective from the time of its rendition because the order granting a new trial was void. In short, the court simply did not reach the question we have here.

We do not believe the order of November 20, 1978, was utterly without effect. The trial court did not undertake to rule on a motion for new trial; no timely after-trial motion was filed. Neither did it purport to "vacate, reopen, correct, amend or modify" its judgment as permitted by the first sentence of Rule 75.01. The court granted a new trial on all issues, and its order, valid on its face, left the cause for trial de novo as if it had never been heard. *Davis v. Lynn,* 354 Mo. 1181, 1184, 193 S.W.2d 609, 610[2] (1946); *Hurley v. Kennally,* 186 Mo. 225, 226, 85 S.W. 357, 358 (1904).

We are aware that in some jurisdictions, void orders are given no countenance whatever. In this jurisdiction, however, orders or decrees which are void, and not merely erroneous, have been considered colorable and subject to being reviewed and reversed on appeal. *Kansas City Sanitary Co. v. Laclede County,* 307 Mo. 10, 14–15, 269 S.W. 395, 397[2][3] (banc 1925); *State ex rel. Coonley v. Hall,* 296 Mo. 201, 212, 246 S.W. 35, 37[3] (banc 1922); *Schumacher v. Schumacher,* 223 S.W.2d 841, 845–846[15] (Mo. App.1949). As noted in *State ex rel. Coonley v. Hall,* supra, 296 Mo. at 212, 246 S.W. at 37, the order was not void until this court determined it was.

■ Nor did our mandate have the effect of restoring the judgment of November 17, 1978, as of the date of its rendition. If an appellate court reverses an order for new trial and orders the judgment reinstated, the effect of the mandate is in reality to affirm the judgment for plaintiff as of the date of its entry. *Reimers v. Frank B. Connet Lumber Company,* 273 S.W.2d 348, 349[1, 2] (Mo.1954).[2] An outright reversal, however, does not operate as a remand; the effect of a general and unqualified reversal of a judgment, order or decree is to nullify it completely and to leave the case standing as if no such judgment, order or decree had ever been rendered. *State ex rel. Bank of Skidmore v. Roberts,* 232 Mo.App. 1220, 1225–1226, 116 S.W.2d 166, 169[6] (1938); *State ex rel. Brown v. McDonnell,* 280 S.W. 66, 69[5] (Mo.App.1925). Even bearing in mind that an appellate court's opinion is part of its mandate, *Dalton v. Johnson,* 341 S.W.2d 596, 600[3] (Mo.App.1960), we cannot construe our mandate in this case as anything but an outright reversal, leaving the record as it stood before the order of November 20, 1978, was entered. If the plaintiffs wanted our mandate to operate as a reinstatement of the judgment as of the date of rendition, their remedy was to file a motion for rehearing or to modify the opinion or mandate. *McWilliams v. Drainage Dist. No. 19, Caldwell County,* 236 S.W. 367, 368 (Mo.App.1922). In any event, our mandate ran on April 2, 1981. The judgment for plaintiffs was reinstated as of that date. Defendants' motion for leave to appeal was filed within 6 calendar months and was timely. We have jurisdiction; the motion to dismiss is denied.

On the merits, by way of general background, it may be observed: The fire which created this controversy occurred in a building located on the south side of Main Street in the City of Cabool, Missouri, about 6:30 p.m. on January 17, 1977. Main Street in Cabool runs generally east and west. The

---

**2.** In *Reimers,* the order of the mandate, stripped of formal language, read "... and the court here being now sufficiently advised of and concerning the premises, doth consider and adjudge that the order of the Circuit Court of Jackson County granting a new trial be reversed, annulled and for naught held and esteemed, and that the said appellant be restored to all things which he has lost by reason of said order. *It is further considered and adjudged by the Court that the said cause be remanded to the said circuit court of Jackson County with directions to reinstate the verdict and judgment for the plaintiff;* ...."

building damaged was one of a number of contiguous but discrete buildings which face the south side of Main Street. This building was occupied by a retail fabric shop and we shall refer to it as the fabric shop.

The building immediately adjacent to the fabric shop on the east was occupied by an upholsterer. We shall refer to this building as the upholstery shop. The fabric shop and the upholstery shop were separated by a firewall. Water was supplied to both buildings through a common ½-inch galvanized water pipe. The common supply pipe ran parallel to the back (south) wall of the fabric shop, under the floor between the sill and the first free joist. The fabric shop's water was supplied through a T-fitting about 6½ feet east of the west wall of the building. The supply pipe beyond (east of) the T-fitting ran through the firewall of the fabric shop into the upholstery shop.

During the month of January 1977, the City of Cabool made a practice of thawing frozen water pipes upon request of its consumers. For this purpose, the water and sewer department used an open-flame butane torch owned and maintained by the city. About 3:30 p.m. on January 17, defendant Brown, an employee of the water and sewer department, was notified that the upholstery shop's water line was frozen. Brown and another employee determined that the upholstery shop had no water "at the meter." Because the area under the fabric shop was excavated and that under the upholstery shop was not, defendants Brown and Jacks went into the basement of the fabric shop to thaw that part of the water supply line which served the upholstery shop. Admittedly, an open-flame torch was used without any shielding between the flame and those parts of the fabric shop adjacent to the pipe. By 6:15 or 6:30 p.m., the fabric shop was afire. This action followed.

The defendants' first point is directed to the sufficiency of the evidence to support a finding that the fire was caused by their negligence. They argue the evidence shows the fire started near a sanitary drainpipe which was not heated; that there was no evidence the water pipe had been dangerously heated near the drain, and the plaintiffs' expert testimony was not sufficient to establish a causal connection between the operation of the butane torch and the resulting fire.

The plaintiffs respond by asserting that there was circumstantial evidence sufficient to warrant a finding that defendants' negligence was a proximate cause of the fire; additionally, plaintiffs maintain they are aided by the doctrine of res ipsa loquitur. Review of the sufficiency point requires us to bear in mind that when a cause is tried to the bench, the trial court functions as the trier of fact who resolves conflicts in the evidence; the trial judge determines the credibility of the witnesses and may accept or reject their testimony in part or as a whole. *State ex rel. Reynolds County v. Riden,* 621 S.W.2d 366, 368 (Mo.App.1981); *Cusumano v. Outdoors Today, Inc.,* 608 S.W.2d 136, 139[4] (Mo.App.1980); *Long v. Lincoln,* 528 S.W.2d 512, 513[3] (Mo.App. 1975). Moreover, the trial court may draw all reasonable and legitimate inferences from the evidence before it and base its ultimate findings upon such inferences. *State ex rel. Eagleton v. Patrick,* 370 S.W.2d 254, 257 (Mo.1963), Annot. 97 A.L. R.2d 1180 (1963); *School Dist. of Springfield R–12 ex rel. Midland Paving Co. v. Transamerica Ins. Co.,* 633 S.W.2d 238, 249[17] (Mo.App.1982).

The activity with which we are immediately concerned occurred in the rear (south) part of the basement under the fabric shop. Examination of the 26 exhibits filed here indicates that the basement was about 5 feet deep. Access to the basement was gained through a double door 4 feet wide and about 5 feet high. There was no illumination in the basement. As noted, the water pipe which supplied both the fabric shop and the upholstery shop ran from west to east under the floor of the fabric shop, parallel and adjacent to the first free joist. That part of the water pipe which ran under the fabric shop was a little over 24 feet long, and had 2 attachments which must be noted.

First, some distance east of the west end of the water line, the pipe was equipped with a T-fitting. The water pipe which rose from the T-fitting supplied the fabric shop; it ran upward through the floor into a "bathroom and storage area" at the rear of the fabric shop. This "bathroom area" was described as being "in the southwestern corner of the building." The bathroom was equipped with a stool and a lavatory. The stool and the lavatory were located "[v]ery close to the back door" of the fabric shop. Defendants' Exhibit A, a photograph, shows that the "back door" was directly above the basement door, "roughly in the center of the store, east and west." We must carefully note that the precise location of the T-fitting is subject to different inferences. Defendants' Exhibit "AA", a diagram prepared some time after the fire, indicates the T-fitting and the pipe which rose from it were about 5 to 6 feet east of the west end of the common supply pipe. Defendants' Exhibit "S", a photograph of the bathroom area, indicates the T-fitting may have been almost 8 feet from the west end of the pipe, which would be 2 to 3 feet closer to the point at which the pipe was heated. As previously noted, and shown by defendants' Exhibits "S" and "L", there was a sanitary drain line adjacent to the water line; this line drained the lavatory and stool and ran from the bathroom down through the floor, then west parallel to and above the water line to a sanitary drain at the southwest corner of the fabric shop.

A short distance east of the T-fitting, the water pipe had been repaired with a clamp. Defendants' Exhibits "F" and "AA" indicate this clamp was about 4 to 6 feet east of the T-fitting. This clamp is referred to as the "westernmost" clamp.

Basically, it was plaintiffs' theory that the fire originated in the bathroom around the water and drainpipe which led to the bathroom. Extrapolation from the exhibits permits a reasonable inference that this point was 4 to 5 feet west of the clamp.

Plaintiffs had the testimony of several witnesses. Ella Mae Byrd, who was operating the fabric shop on January 17, 1977, testified that about 3 p.m., she noticed "fumes"; the olfactory sensation described was "[f]umes, oh, hot pipe—kind of like a hot pipe or hot stove I could smell ...." These "fumes" were more noticeable "back in the back" and the witness could hear "the sound of a torch." The noise and the "fumes" appeared to this witness to have come from the basement area immediately under the bathroom.

David Carter went in the fabric shop about 4 p.m. He noticed no unusual odor or smell at first. Subsequently, he noticed a smell toward the back of the fabric shop, and "the only way [he could] describe it, [it was] an odor that [he associated] with something that had been heated intensely hot; such as, maybe, an iron that had scorched something." Mr. Carter had been in the basement of the fabric shop about a week before the fire; he testified that "at a point just east of [the] bathroom" someone had at some time, insulated a part of the water pipe by wrapping it with numerous layers of newspaper and tying the insulation with wire. This makeshift insulation covered the pipe "18 inches on either side of the [basement] doorway." There was "one place" in the insulation which was missing.

Mr. Joe Carr, whose business occupied the upholstery shop, testified for the plaintiffs. Carr had "called the City Hall" and left word that his water pipe was frozen. Some employees of the City of Cabool arrived thereafter with a torch. When Mr. Carr went below the fabric shop, he found the city employees applying a flame to the pipe west of the basement door. Carr told the workmen that the fabric shop's water supply was not frozen, but "[his] was the one that was froze up." Carr's recollection of the incident was not clear, but he did notice that the flame from the torch was "probably about a foot long."

Defendant Charles Jacks was employed by the City of Cabool at the time of the fire. Jacks was employed by the street department, but the employees of various departments assisted employees of other departments when it was necessary. Jacks accompanied defendant Brown to the basement under the fabric shop.

Jacks' testimony was that the T-fitting from which the fabric shop was supplied was 4 to 5 feet west of the basement door. The water line itself ran "in between the two floor joists," in the neighborhood of 3 to 4 inches from the top (the sub floor) and "5, 6 inches" from the lateral face of the joist. Jacks' testimony was that the line ran between the first and second floor joists; examination of all the exhibits indicates that he, and other witnesses, regarded the joist which rested on the south sill as the "first" joist.

Jacks described the thawing activity as follows: Having been recruited by the water and sewer department, he accompanied defendant Brown to the basement of the fabric shop. Entering the basement, Jacks noticed that the basement door could only be partially opened, because "[t]here was like some debris or some stuff." The east section of the basement was "not all the way dug out" but "you could scoot yourself" and get all the way over to the east wall, where the water pipe entered the foundation of the upholstery shop. Working with a flame 1½ to 2 inches long, Brown "took [the torch] and held it up by the— along parallel to the water line and just kept working it back and forth like—underneath the—on the line." Brown held the torch "maybe 2 to 3 inches" from the pipe, but the flame "might [have], at times" touched the pipe. Brown heated a 12 to 16 inch part of the pipe for "5, 10 minutes," then moved west. That part of the pipe between the east wall up to "the middle of the [basement] door" was heated.

Jacks was asked if he saw any sparks. His answer was he didn't actually see any sparks, but some splinters—like particles on the joist "glowed" and Brown put them out with "his glove." It was his further testimony that he and Brown were under the fabric shop for 45 minutes to an hour. Further, he testified it was quite dark in the basement; it was not "pitch black." There were several old, wooden structures in the basement under the fabric shop, as demonstrated by defendants' Exhibits "D" and "F", but we shall notice these structures, or obstructions, further in the course of the opinion.

Defendant James Brown was called as a witness by both parties. As a witness for the plaintiffs, Brown testified that he was working in the city's water and sewer department at the time of the fire. Having been dispatched to the upholstery shop by radio, Brown went to the fabric shop. He determined that Mr. Carr at the upholstery shop "had no water" at his meter. Brown then went under the fabric shop to attempt to thaw that part of the pipe which served the upholstery shop. As noted, there was a repair clamp bolted around the water pipe just above the middle of the basement door. This clamp, which appears clearly in defendants' Exhibit "F" was the kind of clamp commonly called a "hose clamp." Brown loosened this clamp to determine if the line was frozen at that point. Loosening the clamp produced a "little spray of water" so Brown assumed the pipe was frozen east of the clamp, "unless [there] was a drainback from [the upholstery shop]." Brown began the thawing process, "started with the torch" at the east wall and "worked back to the west." As defendants' Exhibit "D" shows, there is a rudimentary staircase in the southeast corner of the basement, attached, it appears, to the second and third floor joists. Brown "squeez[ed] around" the staircase to begin thawing the pipe; Jacks held a light 4 to 5 feet away, and Brown began heating the pipe.

Brown held the flame "within an inch" of the pipe and occasionally the flame touched the pipe. Brown then heated "a foot or 16 inches" until that part of the pipe became warm, then moved west. Brown identified the pipe as ½-inch galvanized water pipe. He located the pipe as being 2 inches "away" from the lateral face of the joist and 2 inches above the bottom of the joist. Testifying for the plaintiffs, Brown insisted that the flame he used was no longer than 2 inches "because it was under the building." Brown continued heating that section of the pipe west of the basement door—a section 10 to 12 feet long—for "[a] half hour to 45 minutes." He conceded that that period

was longer than normal for a frozen pipe. He also recalled that at one point "a little splinter" caught "not aflame, but aglow," and testified that when he thawed pipes under buildings "a little spark [would] catch." Brown was obliged to abandon his work about 4 p.m., even though he had not thawed the pipe, because he had other urgent duties to perform.

Both parties, of course, produced an expert witness. Plaintiffs called one James Larry Thompson, an investigator for the State Fire Marshal. Thompson investigated the fire on January 19, 1977. This witness was somewhat unsure of the compass direction of all parts of the building he examined, but in light of the exhibits received, his testimony would be clear enough to any trier of fact. Thompson observed a "hole burned in the floor," "to your left" as one entered the basement; defendants' Exhibits "L" and "S" make it clear that this "hole" was that part of the floor underneath the bathroom of the fabric shop. In this area, from beneath, Thompson observed that the joists were charred around a pipe which he "understood" to be a water pipe. Thompson described the pipe as being "in close proximity" to the hole, burnt hole, which he observed in the floor. Thompson's inspection of the building above ground disclosed indications of "high heat," but he noticed no actual structural damage to the front (north) part of the fabric shop. The drop-tile ceiling had fallen, but Thompson could not say whether the ceiling had fallen because of the fire or the firefighting activity. Thompson's inspection indicated the fire "appeared to have come from inside the bathroom."

Asked directly about the point of origin of the fire, Thompson answered: "It appeared that the fire originated in this area around the pipe. And from looking underneath—when I was in the top floor again, in the bathroom back there, *I could see no factors that could cause a fire; such as, wiring or a heater in that area, or anything like that. There was no indication that I saw or could detect of any use of any flammable solvent; such as, gasoline, coal oil, kerosene, what have you.*" (Emphasis ours.)

Thompson further testified that the observations he made and the charring of the wooden structures under and in the bathroom were "consistent" with the fire's having been caused by use of a torch in the basement. As a rule, Thompson said, fire burns upward, unless it originates in a pool of flammable liquid, in which case it tends to follow the trail of the liquid. Thompson was asked a hypothetical question which fairly incorporated the thawing process which the plaintiffs' evidence tended to show, and was asked whether it was *possible* for such use of an open-flame torch to produce a smouldering fire. Thompson's answer was yes. Thompson was asked another hypothetical question directed to his opinion "[whether the thawing activity] *probably* caused the fire." Thompson's answer was "It's highly possible that it could."

Upon cross-examination, it was shown that Thompson was not sure which of the two lines beneath the bathroom—the water pipe and the drainpipe—was which. Defendants make a great deal of this particular uncertainty, but it is not as important as they contend. We do not read Thompson's testimony as indicating he believed the drainpipe had been heated. We consider it entirely logical to infer that if the hole around the drain and water pipe provided a source of draft from below, the joists near that hole might be charred, even if the flame originated several feet to the east.

The defendant called Dr. Virgil James Flannigan, Jr., a professor of mechanical engineering at the University of Missouri at Rolla. Professor Flannigan's credentials were impeccable, so to speak, but he conducted his investigation long after the fire. Professor Flannigan was allowed to testify to two experiments he had performed on mock-ups designed to replicate conditions in the basement of the fabric shop just before the fire. In our opinion, the conditions in which the experiments were performed were so dissimilar to the conditions which existed in the basement of the fabric shop on January 17, 1977, that the results of the

experiments should have been excluded. Needless to say, Professor Flannigan was of the opinion that defendant Brown's use of the open-flame torch could not have caused the fire. Dr. Flannigan did testify that heating a galvanized pipe with an open-flame torch sometimes produces sparks; the source of those sparks can be dirt on the pipe, paint on the pipe, or little chips of metal off the pipe itself. Such is the proof adduced, in detail, as material to this appeal.

Abstract discussion of the law is unnecessary. In the course of deciding *Jones v. Garney Plumbing Company,* 409 S.W.2d 637 (Mo.1966), our Supreme Court considered and distinguished most of the precedents applicable here. In the course of its opinion, the court noted that the mere occurrence of fire does not create an inference of negligence, but when there is evidence which warrants a finding of causal connection between the operation of a torch and a resultant fire, the doctrine of res ipsa loquitur raises the inference of negligence and plaintiff is not required to go further and exclude every other reasonable theory of nonliability on the part of the defendant. *Jones,* supra, at 643–644.

In this case, we are not concerned with the applicability of the doctrine of res ipsa loquitur. Plaintiffs' petition specifically named the servants who were allegedly negligent and a specific act of negligence was pleaded. The doctrine of res ipsa loquitur was not invoked, *Boulos v. Kansas City Public Service Co.,* 359 Mo. 763, 769–771, 223 S.W.2d 446, 449–450 (1949), and plaintiffs must be held to their trial theory on appeal. *Jones v. Missouri Petroleum Products Co.,* 331 S.W.2d 573, 576[3] (Mo.1960). *Jones,* supra, is persuasive because it demonstrates that an inference of negligence may arise from the operation of an open-flame torch in proximity to flammable substances located in the area where the fire starts. *Jones v. Garney Plumbing Company,* supra, 409 S.W.2d at 643–644[4]. In short and in sum our question is whether on the whole record, plaintiffs have produced substantial evidence of actionable negligence, which involves: defendants' duty to protect the plaintiffs from injury, failure to discharge that duty, and injury proximately caused by such failure. *Nichols v. Blake,* 418 S.W.2d 188, 190–191[5] (Mo.1967); *Atcheson v. Braniff International Airways,* 327 S.W.2d 112, 117 (Mo.1959); *Kim Mfg., Inc. v. Superior Metal Treating, Inc.,* 537 S.W.2d 424, 428[1] (Mo.App.1976). There can be no question that the defendants owed plaintiffs a duty to protect its users of water from fires negligently set by its employees, if it was acting in a proprietary capacity. *Adams v. City of Frankford,* 251 S.W. 125 (Mo.App.1923), Annot., 24 A.L. R.2d 241, 292–293 (1952). We know judicially that the City of Cabool is a city of the fourth class, incorporated in 1884. The record makes it clear that in this case, the City of Cabool was attempting to maintain a supply of water to individual consumers; it was therefore liable as any other private supplier of water for profit. *Adam Hat Stores v. Kansas City,* 316 S.W.2d 594, 597 (Mo. banc 1958); *Lockhart v. Kansas City,* 351 Mo. 1218, 1221–1223, 175 S.W.2d 814, 815–816[1, 2] (1943). Injury, which is an essential element of actionable negligence, *Schaeffer v. Accardi,* 315 S.W.2d 230, 234 (Mo.1958), is admitted. The only remaining questions are whether the evidence permits a reasonable inference that (a) the torch was negligently operated, and (b) that this negligence, if any, was a proximate cause of the damage.

The inferences readily permissible from the evidence are: 1) Jacks and Brown were working with an open-flame torch in the dark, cluttered basement of an old, frame structure; 2) that Brown, a regular employee of the city water and sewer department, applied the open flame to a 10- to 12-foot segment of ½-inch galvanized pipe for 30 to 45 minutes continuously and left abruptly to attend to other duties; 3) although the pipe was only 2 to 3 inches from an old, wooden joist, no shielding of any order was placed between the flame and the joist; 4) that the use of an open-flame torch to thaw or repair pipes sometimes produces smoldering fires; 5) that having left to attend to other duties, Brown failed to return to the

fabric shop to ascertain that no smoldering fire had erupted into flame after he left. If the testimony of witness Carter is accepted, the pipe east of the T-fitting was wrapped with inflammable makeshift insulation, and the possibility of creating a smoldering fire was increased.

It was made plain in the first *Gateway* case, *Gateway Chemical Company v. Groves,* 338 S.W.2d 83, 86[4] (Mo.1960), and later in *Jones v. Garney Plumbing Company,* supra, 409 S.W.2d at 643, that the operation of an open-flame torch is not to be regarded as a species of inherently dangerous activity. Nevertheless, the absence of any shielding was considered an important circumstance in *Jones,* supra, as distinguished from the second *Gateway* case, *Gateway Chemical Company v. Groves,* 370 S.W.2d 302 (Mo.1963), where an acetylene torch was being operated inside a fire box and a pressed board was being used as a shield against the "dingle berries."

The type or degree of precaution which should have been taken was a function of the danger and risk reasonably to be apprehended, but certainly in the detailed circumstances some risk of causing a fire should have been appreciated. Other cases from topical collations of authority are illustrative. In *Phoenix Ins. Co. v. Cook,* 93 Ohio App. 503, 113 N.E.2d 925 (1953), a subrogee brought an action in damages based on the theory that the fire in question was caused by the defendant's negligence in using a soldering torch to repair a gutter or tin roof. Observing that the tin roof rested on wood and that the defendant used molten metal, developed in the act of soldering the tin joints, and that the defendant heated the metal and left immediately, the court held the evidence raised a fact question whether the defendant exercised the requisite precaution and reversed a directed verdict for the defendant. In *Schneider v. Rowell's, Inc.,* 5 Wash.App. 165, 487 P.2d 253 (1971), plaintiff, a building contractor, brought an action for damage from a fire allegedly caused by defendant's negligence in the use of a propane torch. Plaintiff was building a group of fourplexes. It was agreed that one of the defendant's employees would work on Saturday installing bathtubs. One of defendant's employees worked on the day of the fire and it was shown that he was the only person on the premises. A considerable part of the work done consisted of installing copper pipe in the "crawl space" of the building. Joints in the copper tubing were fused by "sweating" which involved heating the fittings with a propane torch and applying solder to the joints. It was shown that in sweating the joints, the flame of the torch was often applied to fittings within a few inches of wooden structural components. The defendant's employee left about 4:15 p.m., and a fire was in progress shortly before 6 p.m. There was evidence, as there is in the case before us, that the use of the torch could produce a smoldering fire.

Holding that causation was established, the court observed, 487 P.2d at 255, "The record shows, and it seems obvious, that using a propane torch in the vicinity of dry lumber creates a danger of igniting a fire in that lumber. The evidence also shows that such a fire might not be immediately visible, but rather might smolder for some time after its ignition." The court went on to hold that the workman could be found negligent in failing to inspect the work sites carefully to determine that no fire had been ignited. The cause considered in *Patton v. Dail,* 252 N.C. 425, 114 S.E.2d 87 (1960), is factually similar to the case at hand. After reciting the evidence at length, the court concluded that the following inferences, among others, were permissible: 1) defendant, a plumber, had repaired a leak under a house, using a butane torch to create a sweat joint; 2) the fire originated under the house beneath the bathroom floor and burned a hole about 3½ feet in diameter through the floor and into the house; 3) beneath the hole in the bathroom floor was a piece of pipe defendant had replaced; 4) defendant had finished the repair between 4:30 and 5:30 p.m. on the day of the fire and between 6 and 6:30 p.m. the fire was discovered. From these factual inferences, the court held that a jury could infer the defendant repaired the pipe below the

burnt hole by using an open-flame torch in a negligent and careless manner, so that the wood under the bathroom or its sills were set afire.

■ Recalling the evidence that application of an open flame to galvanized pipe does sometimes produce sparks, and considering the proximity of the pipe to old, wooden structures, we believe a reasonable trier of fact could have found that some sort of shielding between the pipe and the joists should have been used and that Brown was negligent in not using such shielding. Further, we believe a reasonable trier of fact could have found that Brown was negligent in failing to inspect the area adjacent to the pipe carefully for any sign of a smoldering fire. Whether what Brown did in light of the circumstances was sufficient to guard against the degree of danger reasonably to be apprehended was a question for the trier of fact. In so holding, we realize that failure to inspect was not a pleaded ground of negligence, but the pleadings in this court-tried case must be regarded as amended to conform to the proof, Mo.R.Civ.P. 55.33(b) (13th ed. 1982), and defendants' claim of error is simply that there was no evidence of any negligence on their part.

The defendants further maintain that if there was substantial evidence of negligence, there is no substantial evidence of a causal connection between their use of the torch and the fire. This point consists of two specific assertions: 1) that the testimony of plaintiffs' expert Thompson was insufficient to establish causation, and 2) that Thompson was permitted to answer a hypothetical question which assumed facts not in evidence, to defendants' prejudice. Otherwise, defendants diffusely argue that the circumstances would not permit a reasonable trier of fact to infer that Brown's use of the open-flame torch was a proximate cause of the fire.

We have difficulty following the argument concerning the improper hypothetical question. The record does show that Thompson was asked whether, based on his examination of the premises and his experience and training, he could determine where the fire originated. The witness answered that it "appeared" that the fire originated "in this area around the pipe." Repeating himself, the witness said "The fire appeared to have originated in or under the floor around this pipe." Thompson was then asked if he "had been told" that workmen had applied torches to the pipe in an attempt to thaw them. Without objection, the witness was permitted to answer that he had. The witness was then asked if the physical observations he made would be "consistent" with a blow torch having been used *in the area* and a spark catching and flames emitting from it. Thompson answered "it could have happened." Upon cross-examination, it was shown that the witness was not sure whether the very indefinite "pipe" to which he was referring might have been a drainpipe, rather than a water pipe. There was no motion to strike.

■ The difficulty with defendants' argument is that this witness was asked no hypothetical question about the point of origin of the fire, although he was asked such questions about the *cause* of the fire. And, it is clear in context that Thompson was only speaking of the general area around the drainpipe, which was very close to the water pipe. We have no doubt the question and answer based on what the witness "had been told" was improper because it was based on hearsay. A witness' expertise may be based on hearsay; ordinarily, his opinion may not. The function of the hypothetical question is to furnish facts so the expert is not required to depend on hearsay. C. McCormick, Evidence § 14, pp. 31–32 (Cleary ed. 1972); J. Weinstein, Basic Problems of State & Federal Evidence, pp. 197–198. There was, in any event, neither objection nor motion to strike, and the impropriety complained of may not be raised for the first time on appeal. *Cargill v. Armocido,* 476 S.W.2d 506, 507–508[1] (Mo.1972); *State v. Northeast Building Company,* 421 S.W.2d 297, 301[4] (Mo.1967).

A further argument is that Thompson's expert testimony was insufficient to estab-

lish that defendants' use of the open-flame torch was a proximate cause of the fire. The argument is much similar to the objection made to the testimony of the fire warden in *Listerman v. Day and Night Plumbing and Heating Service,* 384 S.W.2d 111, 121[14, 15] (Mo.App.1964), and is rejected for the reasons there stated.

■ In answer to defendant's more general assertion that a trier of fact could not reasonably find a causal connection between Brown's use of the torch and the subsequent fire, we decline to go over the permissible inferences in detail. In *Jones v. Garney Plumbing Co.,* supra, 409 S.W.2d at 644, our Supreme Court held that such an inference may be drawn from proof tending to show the use of a torch in close proximity to inflammable materials. The general collations of authority to which we have referred state the same rule. See Annot., supra, 49 A.L.R.2d at 371. In any event, we doubt that expert testimony was necessary, cf. *Superior Ice & Coal Co. v. Belger Cartage Service, Inc.,* 337 S.W.2d 897, 906–907 (Mo.1960), but as in *Listerman,* supra, 384 S.W.2d at 121, neither party contended that opinion evidence should not be received; indeed, both parties assumed it was necessary. From the facts we have recited in laborious and tedious detail, the trial court could reasonably have inferred that Brown's prolonged use of the torch in proximity to inflammable materials, and his failure to inspect the premises for any evidence of a smoldering fire were the cause of the fire in the fabric shop and it could have done so without resort to speculation and conjecture.

Defendants' final point is that the trial court erroneously applied the law in admitting plaintiffs' Exhibit 1, purporting to show the amount of damage to the contents of the fabric shop, because no proper foundation was laid for the introduction of that document and it had no probative value.

The record shows that the business, up until January 3, 1977, was owned and operated by plaintiffs Ella Mae and Ruby Byrd. An informal agreement of sale was made between Ella Mae and Ruby and plaintiffs Carter at that time, but the agreement was rescinded after the fire. In preparation for the sale, Ella Mae, Ruby and the Carters prepared an inventory of the goods on hand—fabrics—at the time the sale was agreed to. This document was received in evidence as plaintiffs' Exhibit 1. If the values shown by the inventory are accepted as correct, plaintiffs Ella Mae Byrd and Ruby Byrd had goods of the value of $43,-533.88 on hand on January 3, 1977. It was further shown in evidence that after the fire, goods of the value of $1,500.00 were salvageable. The trial court awarded plaintiffs Ella Mae and Ruby Byrd the sum of $40,000.00 as damages for loss of goods destroyed in the fire.

Defendants contend that "no proper foundation" was laid for the admission of the document. They cite *Armstrong v. Croy,* 176 S.W.2d 852, 854[4] (Mo.App.1944), to support this contention. In *Armstrong,* plaintiff brought suit on an open account. Plaintiff was unable to explain the nature of the items charged to defendant on a document purporting to be an itemized statement of account. Plaintiffs' testimony on cross-examination ran thus: "Q. July 22nd, $15.00. A. $15, I *believe* is a sample casting again. * * * Q. July 29, $1.60. A. That is another small order, *possibly* one or two castings." Plaintiff also testified he never kept any books on the particular account, and there was no proof that the itemized statement was made from original sales tickets or copies thereof, nor any proof that the statement qualified as a business record. The court rejected the statement.

■ In this case, the inventory was prepared for purposes of sale. Ella Mae Byrd and Ruby Byrd went over every item with the Carters. The Carters agreed to pay the inventory price, and had made a down payment of $23,500.00 on the total purchase price. We do not view the Carters' agreement as conditional, nor do we regard the rescission of the contract of sale as determinative. Evidence of the price at which personal property, the value of which is in issue, was brought at a bona fide voluntary sale, at some time near the time

as of which value is to be determined is evidence of the value of that property. *Condition Air Corp. v. Rock Island Motor Transit Co.,* 253 Iowa 961, 114 N.W.2d 304, 308[5], 3 A.L.R.3d 679, 684 (1962); cert. denied 371 U.S. 825, 83 S.Ct. 46, 9 L.Ed.2d 64 (1962); *Myers v. American Indemnity Co.,* 457 S.W.2d 468, 471[5] (Mo.App.1970); *Rosenblatt v. Winstanley,* 186 S.W. 542, 543[4] (Mo.App.1916); 4 Sedgwick, Damages § 1298 (9th ed. 1912); 29 Am.Jur.2d, Evidence § 389 (1967). We agree with plaintiffs that the inventory was proper evidence of the value of the goods destroyed.

Finally, defendants contend there was no substantial evidence to support an award of $5,723.00 to plaintiffs Eli, Ruby and Ella Mae Byrd for damage to the building. Mr. Carter purchased the building from plaintiffs Byrd after the fire. Carter had evidence that the cost of repair was $5,723.00. As this court noted in *Langdon v. Koch,* 393 S.W.2d 66, 69 (Mo.App. 1965), the cost of repair of a chattel is competent evidence to show the value before and the value after the injury or damage, but such evidence is not conclusive, because there may be repairs which enhance the value of the property as well as those which effect a restoration in value. Carter testified that his repair cost included some items not attributable to the fire, but some damage done by the fire was not repaired. "Overall," the building was in the "same shape" as before the fire. From this evidence, and the evidence of plaintiff Eli Byrd, a co-owner of the building who testified the building was worth $15,000.00 before the fire, we believe the trial court could have inferred that the fair market value of the building before the fire was $15,000.00 and $9,276.74 after the fire. We find no error in awarding plaintiffs Byrd the cost of repair as damages to the building.

We find no error materially affecting the merits of the action; accordingly, the judgment is affirmed.

GREENE, C.J., and TITUS, FLANIGAN and MAUS, JJ., concur.

BILLINGS, J., concurs in result.

PREWITT, J., disqualified.